**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **HILDA ORTEGA,** | : | Case No. 1:13-CV-02080 |
| Plaintiff, | : | |
| v. | : | |
| **CAROLYN W. COLVIN,** | : | **MAGISTRATE'S REPORT AND** |
| | : | **RECOMMENDATION** |
| Acting Commissioner of Social Security | | |
| Defendant. | | |

## I. INTRODUCTION.

This case was automatically referred to the undersigned Magistrate Judge for report and recommendation pursuant to 72.2(b)(2) of the UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO LOCAL CIVIL RULES.  Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of Defendant's final determination denying her claims for Disability Insurance Benefits (DIB) made pursuant to Title II of the Social Security Act (Act)[1] and Supplemental Security Income (SSI) under Title XVI of the Act[2].  Pending are the Briefs of the parties (Docket Nos. 15 & 16).  For the reasons set forth below, the

---

[1]

In order to receive DIB, the claimant must show that he or she was rendered disabled on or before the expiration of their insured status.  42 U.S.C. §§ 423(a)(1)(A), 423(c)(1) (Thomson Reuters 2014).

[2]

SSI is a supplemental program of last resort for people with no other source of income.  42. U.S.C. § 1382 (Thomson Reuters 2014).  Under SSI, there is no period of time during which a claimant must be insured. *See* 20 C.F.R. §§ 416.202, 416.203(b), 416.335 (Thomson Reuters 2014).

Magistrate recommends that the Court affirm the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

Plaintiff applied for DIB on March 1, 2011, alleging that she became unable to work because of her disabling condition on October 31, 2004 (Docket No. 11, pp. 204-206 of 738).  On March 14, 2011, Plaintiff applied for SSI and any federally administered State supplementation under Title XVI of the Act, alleging that her disability began on October 31, 2004 (Docket No. 11, pp. 206-208 of 738).  Following the administrative denials both on initial review and reconsideration (Docket No. 11, pp. 125-127, 132-134, 140-143, 146-148 of 738), Plaintiff requested a hearing before an Administrative Law Judge (ALJ) (Docket No. 11, pp. 153-154 of 738).  On May 21, 2012, Plaintiff, represented by counsel and Vocational Expert (VE) Mark Anderson appeared before ALJ Penny Loucas (Docket No. 11, pp. 29-59 of 738) and on June 21, 2012, ALJ Loucas rendered an unfavorable decision (Docket No. 11, pp. 11-23 of 738).  The Appeals Council denied Plaintiff's request for review on August 13, 2013 (Docket No. 11, pp. 5-7 of 738).  Plaintiff filed a timely Complaint in the United States District Court for the Northern District of Ohio to challenge the denial of benefits (Docket No. 1).

## III. FACTUAL BACKGROUND.

At the commencement of the administrative hearing, Plaintiff withdrew her Title II claim because there was insufficient evidence of disability preceding the date last insured.  Plaintiff proceeded on her Title XVI application only (Docket No. 11, pp. 33-34 of 738).  In making a determination as to whether Plaintiff was disabled under Title XVI, the ALJ solicited her testimony and the testimony of a VE.  The following is a narrative summary of answers provided by Plaintiff and the VE in response to inquiries made by the ALJ and counsel.

A.    PLAINTIFF'S TESTIMONY.

Plaintiff was married with two sons, ages six and ten. She had a driver's license and  drove her sons to school daily about ten to fifteen minutes away.  Plaintiff completed a six-month course in computer operations;(Docket No. 11, pp. 37, 38, 39, 49 of 738).     From 1996 until 2000, Plaintiff was placed through a temporary agency at KEYBANK where she maintained the position of data entry clerk until the department was downsized (Docket No. 11, p. 37 of 738).  The last time Plaintiff actively searched for employment was in 2003.  She completed several applications but she was unable to attend the interviews.  In fact, she was no longer capable of working if she was required to leave home (Docket No. 11, pp. 37-38, 51 of 738).

Plaintiff discussed four impairments:  (1) back pain, (2) depression, (3) fibromyalgia and (4) left leg pain.  Plaintiff's chronic back pain was unrelated to her fibromyalgia.  Measuring the pain on a pain quality scale on which 10 denoted the most severe pain, Plaintiff rated her pain level at 7 or 7½ out of ten.  Plaintiff's medications  included a pain reliever and muscle relaxer (Docket No. 11, p. 45 of 738).

Additionally, Plaintiff underwent treatment at the CENTER FOR WOMEN AND CHILDREN for symptoms associated with anxiety and/or depression with agoraphobia, suicidal thoughts, panic attacks and paranoia.  Plaintiff was housebound, leaving only when she had an appointment with her physician. Plaintiff left the house accompanied by her husband or children.  Her thoughts of suicide were undefined. During a panic attack, Plaintiff noted an elevation in blood pressure and heart rate and nausea.  Plaintiff felt as though she were being watched; consequently,  she kept the curtains and doors closed.  She panicked when an unrecognized number appeared on the caller identification feature of her telephone (Docket No. 11, pp. 48, 50-51 of 738).

Approximately one year prior to the hearing, Dr. Deepak Raheja, a neurologist, diagnosed Plaintiff

3

with fibromyalgia, a disorder characterized by chronic fatigue and widespread musculoskeletal pain in the arms, forearms, calves and hips.  Plaintiff supplemented her drug therapy with non-medical treatment which included napping, diet modification and exercise (Docket No. 11, pp. 41, 42, 48 of 738).

Plaintiff's left leg pain was manifested by a muscle spasm and numbness.  Plaintiff ambulated with a cane occasionally and her leg was prone to collapse when numb (Docket No. 14, pp. 43-44, 46 of 788).

With respect to her functional limitations, Plaintiff estimated that she could (1) carry ten-pounds from the counter for three steps; (2) walk ten minutes before requiring a break; (3) stand for fifteen minutes before requiring a break; and (4) sit for one half hour before the onset of back pain (Docket No. 11, pp. 46, 47 of 738).

During a typical day, Plaintiff drove her children to school, returned home and during the next fifteen minutes, organized her sons' disarray.  Plaintiff took a nap until 11:00 A.M., spent a half hour preparing lunch and then completed her household chores.  Plaintiff spent her evenings caring for her children, assisting them with homework and preparing family meals.  She retired around 7:00 P. M. and slept until 6:30 A.M.  Plaintiff shopped and visited family only when accompanied by her husband and/or children (Docket No. 11, pp. 39, 40, 42-44, 49, 50 of 738).

**B.    VE's testimony.**

The VE reviewed the record and agreed that he would advise if his opinions were not consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a United States Department of Labor publication that organizes jobs in the United States economy based on their similarities and defines the structure and content for performance of all listed occupations.  DOT, 1991 WL 654964 (4th ed. 1991).  First, the VE classified Plaintiff's past work as a data entry clerk according to its occupational definition in (1) DOT; (2) by its skill level; (3) the level of physical exertion; and (4) the amount of lapsed time a typical worker

4

could learn the techniques, acquire the information and develop the facility for average performance of

the mail sorter, sales clerk and cashier jobs (Specific Vocational Preparation (SVP)):

| (1) DOT | (2) SKILL LEVEL | (3) LEVEL OF PHYSICAL EXERTION | (4) SVP |
|---------|-----------------|-------------------------------|---------|
| Data entry clerk 203.582-054 | Semiskilled work is work which needs some skills but does not require doing the more complex work duties; such jobs may require alertness and close attention, coordination and dexterity as when hands or feet must be moved quickly to do repetitive tasks.  20 C.F.R. §§ 404.1568, 416.968. | Sedentary level of exertion involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools . . . a certain amount of walking and standing is often necessary in carrying out job duties.   20 C.F.R.  §§  404.1567(a), 416.967(a). | 4--over three months up to an including six months. Www.onetonline.org. |

(Docket No. 11, p. 52 of 738).

The ALJ posed the *first* hypothetical as a purely physical RFC with no mental limitations: Consider a hypothetical worker who can engage in light exertion, occasionally pushing-pulling bilaterally, frequent stairs and ramps, never any ladders, ropes or scaffolds, unlimited in balancing, occasional stooping, kneeling, crouching, crawling, up to occasional overhead reaching bilaterally, and who must avoid moderate exposure to hazards.  As you review the hypothetical, can you tell me whether or not there is any work consistent with the claimant's past work that can still be performed?

The VE opined that based on this hypothetical, Plaintiff's past work "would be available" (Docket No.

11, p. 53 of 738).

The ALJ posed the *second* hypothetical that added a mental component to the same physical

limitations posed in hypothetical number one:

Can understand, remember and carry out simple and detailed instructions frequently, up to occasional complex instructions, can maintain concentration, persistence and pace over a normal workday and workweek for work that is not machine pace driven; work independently or in a small group setting, can adjust to normal changes in a workplace setting and can make work related decisions.  Can the claimant perform Plaintiff's past work with these limitations?

The VE opined that past work would still be available based on these additions (Docket No. 11,

p. 53 of 738).

The ALJ posed a *third* hypothetical:

5

Let's keep it at light exertion with occasional push-pull, postural activities such as climbing stairs, ramps, bending, stooping, crouching, crawling and kneeling are all frequent, but never any ladders, ropes or scaffolds, and unlimited balancing, up to occasional overhead reaching bilaterally, and cannot lift anything over 8 pounds overhead in that regard.  Can lift up to 8 pounds occasionally but not overhead.  Avoid moderate exposure to hazards and keep the same limitations.

The VE explained that Plaintiff's past work would still be available based on hypothetical number three (Docket No. 11, p. 54 of 738).

The ALJ posed a *fourth* hypothetical:

I am going to say light [exertional level], a sit-stand option where the work could still be performed with no interruption and being off task and changing positions.  And everything else remains the same.

The VE opined that the hypothetical person could perform work as a data entry clerk provided there was a hydraulic work station.  There were other jobs described as follows:

| (1) JOB/DOT. | (2) SKILL LEVEL. | (3) EXERTIONAL LEVEL. | (4) NUMBER OF JOBS. |
|---|---|---|---|
| Mail clerk 209.687-026 | Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  20 C.F.R. §§ 404.1568(a), 416.968(a) | Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . a good deal of walking or standing, . . . when it involves sitting most of the time, there will be some pushing and pulling of arm or leg controls.   20 C.F.R.  §§  404.1567(b), 416.967(b). | 195,000/9,500/3,500 |
| Electronic worker 726.687-010 | Unskilled | Light | 240,000/13,000/3,500 |
| Assembler 739.687-030 | Unskilled | Light | 217,000/10,000/3,500 |

(Docket No. 11, pp. 55-56 of 738).

In response to counsel's inquiry, the VE made a few noteworthy comments based on his experience and observations:

(1)     Traditionally, the jobs of mail clerk, electronic worker and assembler can be done either seated or standing.  The only caveat is that the hypothetical worker must stay on pace and

6

not spend more than five to seven minutes switching positions (Docket No. 11, p. 56 of 738).

(2)     The DOT does not distinguish overhead reaching but based on the VE's experience, the mail clerk and electronic worker jobs would require reaching on a frequent basis in front and the assembler position requires constant reaching in front.

(3)     After the 30 days probationary period, the customary absences tolerated by an employer were two.  This includes late arrivals or early departures.  This may be in combination with sick leave and vacation leave (Docket No. 11, pp. 57-58 of 738).

(4)     If the terms of hypothetical number four were amended to include lifting and/or carrying five pounds maximum, the jobs would not be available.  At five pounds, the exertional level is significantly below sedentary and the VE would be required to conduct further research outside of the DOT to find jobs that accommodate this eroded sedentary work base (Docket No. 11, p. 58 of 738).

(5)     The skills from Plaintiff's data entry job would not transfer to other sedentary work because of its specificity (Docket No. 11, p. 58-59 of 738).

## IV.  MEDICAL EVIDENCE.

### A.     METROHEALTH FAMILY PRACTICE CLINIC.

Beginning in April 2004, Plaintiff consulted with a certified nurse practitioner in the DEPARTMENT OF OTOLARYNGOLOGY (DO), regarding chronic rhinitis and bilateral preauricular (anterior to the auricle of the ear) fistulas (an abnormal passage from one epithelial surface to another epithelial surface).  The right fistula was infected and pending its removal, Plaintiff was prescribed an antibiotic and encouraged to treat the infected area with local heat massage (Docket No. 11, pp. 461-464 of 738; STEDMAN'S MEDICAL DICTIONARY 329950, 149930 (27th ed. 2000)).

On November 17, 2004, Plaintiff presented with complaints of dizziness and chest pain.  The cause of the dizziness was traced to allergic rhinitis and the chest pain was related to Tietze Syndrome, an inflammatory condition characterized by pain and swelling at the junction of the ribs and costal cartilage in the front of the rib cage (Docket No. 11, pp. 454-456 of 738; STEDMAN'S MEDICAL DICTIONARY 397030

7

(27th ed. 2000)).

On June 15, 2005, Plaintiff was diagnosed with acute sciatica status post discectomy.  Plaintiff was prescribed prednisone and physical therapy (Docket No. 11, p. 450 of 738).

By January 12, 2006, the fistula recurred (Docket No. 11, pp. 444-445 of 738) and on February 13, 2006, Dr. Tung T. Trang, M. D., an otolaryngologist, removed a right preauricular cyst (Docket No. 11, pp. 444-445, 484-485 of 738, www.healthgrades.com/physician/dr-tung-trang).  After the surgery, Plaintiff had a persistent sore throat and nasal congestion.  On February 16, 2006, the wound was cleaned and medication used to treat bacterial infections was continued (Docket No. 11, p. 434 of 738).

In the interim, Plaintiff sought treatment at the emergency room for complaints of tingling in the upper and lower extremities on February 10, 2006 (Docket No. 11, pp. 436-437 of 738).

Since May 16, 2006, Plaintiff suffered with neck pain and left shoulder pain; however, on May 30, 2006, the radiological view of the lateral cervical spine showed no identifiable abnormality.  Plaintiff was diagnosed with muscle strain (Docket No. 11, pp. 372, 431-432, 477 of 738).

On June 16, 2006, Plaintiff was prescribed an antibiotic to treat complaints of continuing right ear pain and swelling (Docket No. 11, pp. 429-430 of 738).

On July 14, 2006, Plaintiff underwent a preauricular cyst excision (Docket No. 11, p. 481-482 of 738).

On September 7, 2008, Plaintiff complained of low back pain and Dr. Sasikala Royyuru, M.D., a family practitioner, prescribed a medication with a dual purpose of treating depression, anxiety disorder, and fibromyalgia pain (Docket No. 11, pp. 425-427 of 738; www.nlm.nih.gov/medlineplus/druginfo/meds; www.healthgrades.com/physician/dr-sasikala-royyur).

Plaintiff presented for a routine physical examination on January 22, 2010.  A full lipid profile and

a basic metabolic panel were ordered (Docket No. 11, pp. 422-423 of 738).  Plaintiff returned to the emergency department on January 26, 2010, complaining that she had been dizzy and the dizziness precipitated nausea.  A number of biochemical and diagnostic tests were administered and Plaintiff was ultimately diagnosed with benign positional vertigo (Docket No. 11, pp. 412-421 of 438).

On May 6, 2010, Plaintiff presented for follow-up on her lower back pain and depression.  She was prescribed a non-steroidal pain medication and anti-depressant (Docket No. 11, pp. 405-411 of 738).

On May 10, 2010, Dr. Jihad Jaffer, M.D., a specialist in the PHYSICAL MEDICINE AND REHABILITATION DEPARTMENT (PMR), prescribed a muscle relaxant (Docket No. 11, pp. 400-403 of 738; www.healthgrades.com/physician/dr-jihad-jaffer).

Plaintiff underwent an electrocardiogram and cardiac stress test on May 26, 2010.  Results from the electrocardiogram showed an elevated heart rate but no significant abnormality or significant change from the prior electrocardiogram.  Results from the cardiac stress test revealed a sinus rhythm within normal limits, normal stress wall motion in the entire left ventricle and no rhythm abnormality (Docket No. 11, pp. 467-470, 487 of 738).  On May 27, 2010, Plaintiff presented with low back pain and the results from the electromyography showed no evidence of active denervation to support active radiculopathy (Docket No. 11, pp. 539, 541-543 of 738).

Dr. Jaffer continued the medications used to treat nerve pain on June 15, 2010 (Docket No. 11, pp. 397-399 of 738).  On June 18, 2010, Plaintiff underwent radiographic studies of her pelvis and hips, the results of which were unremarkable (Docket No. 11, pp. 465-466 of 738).  Plaintiff presented to the OSTEOPATHIC MANIPULATION DEPARTMENT (OMD) on June 20, 2010 and was advised that there were no identifiable abnormalities detected in the radiological views of the cervical spine (Docket No. 11, pp. 381-382 of 738).  On June 23, 2010, Plaintiff met with a registered dietitian, Rochelle A. Smith, who

9

conducted comprehensive nutrition education designed to assist in lowering her lipid levels (Docket No. 11, pp. 386-388 of 738).

Family medicine specialist Dr. Amardeep Angroola performed a psychological diagnostic assessment on July 22, 2010, during which Plaintiff admitted that among other things, she was depressed, suffered from paranoia,  had a positive suicidal ideation and suffered with panic attacks.  Using the standard five-axis classifications, Dr. Angroola evaluated Plaintiff's mental disorders consistent with the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS:

| THE FIVE-AXIS MODEL USED TO ACCOUNT FOR THE PATIENT'S MENTAL HEALTH. | DR. ANGROOLA'S IMPRESSIONS OF PLAINTIFF'S MENTAL STATUS. |
| --- | --- |
| I.  Clinical Disorders | Depression, panic disorder with agoraphobia, ? Bipolar type 2 |
| II. Personality Disorders and Intellectual Disabilities | Deferred |
| III. General Medical Condition | Migraine, lower back pain |
| IV. Psychosocial and environmental Disorders | No social stressors at present |
| V.  The GAF | 50-60.  A score of 50 denotes serious symptoms or any serious impairment in social, occupational, or school functioning while a score of 60 denotes moderate symptoms or moderate difficulty in social, occupational, or school functioning. |

(Docket No. 11, pp. 377-379 of 738; www.healthgrades.com/physician/dr-amardeep-angroola).

After a determination that (1) the radiographic views of Plaintiff's spine were unremarkable and (2) Plaintiff tolerated the video exercises well, she was considered a good candidate for physical therapy (Docket No. 11, pp. 367-370, 371-372 of 738).

On August 10, 2010, Plaintiff presented to PMR and Dr. Jaffer recommended that Plaintiff continue physical therapy but he also sent her for an epidural steroid injection (Docket No. 11, pp. 365-366 of 738).

On September 29, 2010, Plaintiff presented to OMD, where Dr. Joseph D. Baker, II, D.O., a geriatrician, noted that Plaintiff had postpartum depression and that with treatments, her thoracic spine showed good improvement and her lumbar spine showed some improvement (Docket No. 11, pp. 357-359 of 738; www.healthgrades.com/physician/dr-joseph-baker).

On January 28, 2011, Plaintiff presented to Dr. Ranier A. Ng, D.O., a specialist in osteopathic manipulative therapy, complaining of left ear discomfort.  The ear examination did not indicate any infections and Dr. Ng referred Plaintiff to an audiologist to rule out a temporomandibular joint disorder (Docket No. 11, pp.  345-349 of 738; www.healthgrades.com/physician/dr-ranier-ng).

The results of the chest X-ray administered on March 1, 2011, showed a normal cardiac and mediastinal silhouette and no acute cardiopulmonary process (Docket No. 11, p. 464 of 738).  On March 8, 2011, Plaintiff was diagnosed and treated for acute inflammation or infection of the ear and throat (Docket No. 11, pp. 342-343 of 738).

Dr. Ng performed a functional capacity evaluation on April 18, 2011, noting the following:

(1)     Plaintiff was taking Paxil with some success as to her anxiety and depression.
(2)     Due to agoraphobia with panic disorder, Plaintiff missed two appointments and was discharged from the psychiatric department.
(3)     Plaintiff was restarted on Zocor, a lipid lowering agent (Docket No. 11, pp. 561, 631-641 of 738).

On September 21, 2011, Plaintiff presented to the emergency department after falling down the stairs and landing on her back.  The radiological evidence confirmed (1) that there was no acute fracture; (2) the presence of mild retrolisthesis of L4 on L5; (3) disc space narrowing at the L4-5 and L5-S1 levels; (4) the disc spaces were adequately maintained; and (5) the paraspinal soft tissues were unremarkable. Plaintiff was referred to a back specialist, prescribed analgesics and restricted to light duty (Docket No. 11, pp. 607-616, 653-668 of 738).

11

Plaintiff underwent an X-ray study on December 12, 2011.  She was diagnosed with primary localized osteoarthritis of the ankle and foot (Docket No. 11, pp. 672-681 of 738).

On March 18, 2012, Plaintiff was involved in a motor vehicle accident during which she sustained no lacerations, bleeding, deformities, contusions, abrasions or burns (Docket No. 11, pp. 736-738 of 738).  Transported to the emergency department, Plaintiff was diagnosed with cervical sprain and there were possible new displaced osteotomy fragments in the right foot (Docket No. 11, pp. 724-735 of 738).

### B.    CLEVELAND CLINIC.

Dr. Adrian M. Zachary, D.O., a pain medicine specialist, diagnosed Plaintiff with an unspecified disease of the central nervous system in which the myelin sheath of the neurons was damaged.  Clinical and diagnostic imaging of Plaintiff's brain and spine were ordered (Docket No. 11, pp. 316-317 of 738; www.healthgrades.com/physician/dr-adrian-zachary).

On January 29, 2010, Plaintiff underwent medication reconciliation with a registered nurse.  On this date, Plaintiff rated her pain at a 7 of 10, with 10 being most severe (Docket No. 11, pp. 318-319 of 738).

In the SPINE MEDICATION WALKER DEPARTMENT, on February 3, 2010, Dr. Paul M. Ruggieri, M. D., a neuroradiologist, interpreted and reviewed a magnetic resonance imaging (MRI) of Plaintiff's thoracic and cervical spine and brain.  The results were:

(1)    A small mass at T6 may represent a small dermoid which has no impact on the adjacent cord.
(2)    A small eccentric disk protrusion at T12-L1.
(3)    Minimal nonspecific supratentorial white matter disease; otherwise, normal brain.
(4)    Normal cervical spine.
(5)    Normal brain (Docket No. 11, pp. 319-325, 329-337 of 738; www.healthgrades.com/dr-paul-ruggieri).

Plaintiff underwent medication reconciliation on February 19, 2010, with the nurse practitioner.

12

She rated her pain as a 9 of 10, with 10 being most severe (Docket No. 11, pp. 313, 326-328 of 738).

Dr. Zachary discussed the results of Plaintiff's brain and cervical MRI on February 19, 2010. There was a lack of clear evidence that would suggest cord disease, brain tissue disease or an abnormal growth; however, due to complaints of worsening sensation of tingling, tickling, prickling, pricking or burning of the skin, Dr. Zachary ordered additional diagnostic tests of the lumbar spine (Docket No. 11, pp. 311-312 of 738).

On March 5, 2010, Plaintiff again underwent medication reconciliation with a registered nurse (Docket No. 11, pp. 308-309 of 738).

On March 8, 2010, Dr. Zachary ordered a repeat MRI and suggested epidural blocks as the next step provided the conservative treatment failed (Docket No. 11, p. 307 of 738).

The MRI administered on March 19, 2010, showed moderate disk degeneration with endplate changes and mild posterior annular disk bulging (Docket No. 11, pp. 314-315 of 738).

### 3.    DR. DEEPAK RAHEJA, M.D. NEUROLOGIST.

On January 14, 2011, Dr. Raheja consulted with Plaintiff regarding complaints of neck pain and lower backache.  He examined Plaintiff's systems, considering in particular her history of diagnostic tests of the cervical and thoracic spine as well as her central nervous system.  Dr. Raheja affirmed the diagnoses of cervical disc disease, lumbar disc disease and failed back syndrome and suggested that Plaintiff refrain from strenuous physical activities, use a back brace and undergo additional diagnostic testing (Docket No. 11, pp. 494-496 of 738; www.healthgrades.com/physician/dr-deepak-raheja).

An MRI of the thoracic spine was administered on February 21, 2011.  There was evidence of central disc herniation at T-12; otherwise, the tests were normal for MRI of the thoracic spine (Docket No. 11, p. 492 of 738).

On March 30, 2011, Dr. Raheja completed a medical source statement focused on Plaintiff's physical capacity.  Dr. Raheja determined that:

(1)   Plaintiff could lift less than five pounds.
(2)   Plaintiff had a herniated disk which affects her ability to stand/walk.
(3)   Plaintiff's ability to sit affected her impairment.
(4)   Plaintiff could climb, balance, stoop, crouch, kneel and crawl frequently or from 1/3 to 2/3 of an eight-hour workday.
(5)   Plaintiff could rarely or never reach, handle, feel, engage in fine manipulation and gross manipulation and Plaintiff could frequently push/pull.
(6)   Plaintiff required rest at two-hour intervals and she needed a sit/stand option.
(7)   Plaintiff had been prescribed a brace and TENS unit.
(8)   Plaintiff's pain was severe (Docket No. 11, pp. 508-509 of 738).

Dr. Raheja requested a chemical test for aldosterone levels and radiological tests of kidney and bladder functions.  On January 16, 2012, the sample collected showed normal levels of aldosterone, well within the set values used by healthy individuals.  Both kidneys were normal in size and morphology and the urinary bladder was unremarkable (Docket No. 11, pp. 721, 723 of 738).

**4.   CLEVELAND BACK AND PAIN MANAGEMENT CENTER AND DR. JOHN NICKELS, M.D., A PAIN MEDICINE SPECIALIST.**

Plaintiff had a series of evaluations and advanced imaging under the care of Dr. Nickels. Generally, Plaintiff completed a pain diagram at each office visit to assist treatment.  On October 28, 2010, Dr. Nickels' clinical impression was that Plaintiff had lumbar radiculopathy and history of back surgery. Plaintiff was considered a low risk for opioid abuse and Dr. Nickels prescribed narcotic pain relief (Docket No. 11, pp. 521-526, 549-553 of 738; www.healthgrades.com/physician-dr.john-nickels).

On November 29, 2010, Plaintiff explained that as her pain worsened so did her depression (Docket No. 11, p. 520 of 738).

On January 10, 2011, Dr. Nickels adjusted the prescription for Vicodin as it was not relieving the pain in its present state (Docket No. 11, p. 519 of 738).

14

On February 11, 2011, results from a basic metabolic panel were within the set values used by health professions to interpret what is normal in healthy individuals (Docket No. 11, p. 528 of 738).

On February 17, 2011, the MRI of the shoulder showed tendinosis of the rotator cuff (Docket No. 11, pp. 511-512 of 738).

On February 21, 2011, Dr. Nickels opined that the medication was helping Plaintiff's pain without side effects.  Plaintiff's pain was aggravated by weather changes and she did experience muscle spasms. He also noted that Plaintiff suffered from depression (Docket No. 11, pp. 518-519 of 738).

Dr. Nickels decided on April 4, 2011, to "stay the course" with respect to the pain medication treatment (Docket No. 11, pp. 516-517 of 738).  On April 7, 2011, Dr. Nickels completed a medical source statement of Plaintiff's physical capacity and determined that:

(1)     Plaintiff could lift/carry up to five pounds frequently and occasionally.
(2)     Plaintiff could stand/walk a total of one hour during an 8-hour workday.
(3)     Plaintiff could stand/walk for 20 minutes without interruption.
(4)     Plaintiff could sit for a total of two hours in an 8-hour workday and for 30 minutes without interruption
(5)     Plaintiff could rarely climb, stoop, crouch, kneel, crawl, push/pull.
(6)     Plaintiff could occasionally balance and reach.
(7)     Plaintiff could frequently handle, feel, engage in fine and gross manipulation.
(8)     Plaintiff environmental limitations–heights, moving machinery and temperature extremes–were all affected by her impairments.
(9)     Plaintiff required a sit/stand option (Docket No. 11, pp. 555-557 of 738).

On May 16, 2011, Dr. Nickels noted the presence of paresthesia.  The medication regimen was continued (Docket No. 11, p. 588 of 738).

On June 27, 2011, Dr. Nickels noted again that the medication was working and that there were side effects such as nausea (Docket No. 11, p. 587 of 738).

Dr. Nickels administered nerve blocks on August 23, 2011, August 30, 2011 and September 8, 2011 (Docket No. 11, pp. 625-627 of 738).

15

Dr. Nickels conducted follow-up visits on September 19, 2011, October 31, 2011, December 12, 2011, January 9, 2012, March 5, 2012, April 2, 2012 and April 12, 2012.  During each session, Dr. Nickels oversaw Plaintiff's pharmacologic pain management, assessing the success of the medication, side effects and frequency of muscle spasms.  Plaintiff consistently reported that the medication was helping her pain and that there were no side effects (Docket No. 11, pp. 620-624, 698-704 of 738).

In a letter dated October 24, 2011, Dr. Nickels provided a comprehensive overview of Plaintiff's medical disorders and conditions to the extent of his treatment.  He recounted that Plaintiff's back injury occurred as the result of a fall when she was in the last trimester of her pregnancy.  He opined that Plaintiff was totally disabled by her severe impairments, namely, lumbar radiculopathy with lumbar disk herniations, failed back surgery syndrome, disk herniation at T12, degenerative disc disease in the lumbar spine, fibromyalgia and depression (Docket No. 11, pp. 618-619 of 738).

Dr. Nickels referred Plaintiff to Dr. Alan L. Wittenberg, D.P.M., for an apparent non-work related injury to her feet on January 9, 2012.  Dr. Wittenberg removed a nerve tumor on February 7, 2012 and on March 23, 2012, he treated Plaintiff for right foot pain arising from a car accident (Docket No. 11, pp. 684-695, 697 of 738).

5.    **WESTSHORE FAMILY CLEVELAND.**

Plaintiff underwent a series of office visits for prescription refills and routine diagnostic tests.  On November 15, 2011, Plaintiff's cholesterol was elevated above normal levels; and on November 29, 2011, Plaintiff was referred to a psychiatrist to deal with issues of agoraphobia (Docket No. 11, pp. 705-710 of 738).

6.    **CENTER FOR WOMEN AND CHILDREN**.

Plaintiff was referred by her mother for treatment of depression.  Beginning on January 9, 2012,

16

Plaintiff underwent the initial indoctrination of the counseling process.  Thereafter, clinician Marian Bruening facilitated counseling with Plaintiff on January 19, 2012, January 26, 2012, March 6, 2012, March 13, 2012 and April 16, 2012.  During these sessions which typically lasted an hour, Ms. Bruening assisted Plaintiff with identifying the source of her depression (Docket No. 11, pp. 713-718 of 738).

On February 3, 2012, Plaintiff underwent a psychiatric evaluation.  Dr. Eduardo Vazquez determined that Plaintiff had been depressed since age 15  and that her psychiatric history was positive in that her mother had depression and anxiety.  However, her mother had responded well to anti-depressants.    Dr. Vazquez noted that Plaintiff was of average intelligence and good insight; her mood was sad and anxious; her affect was restricted; she was not suicidal or homicidal; her thinking was logical, linear and relevant and she was not delusional or hallucinatory.  Using the standard five-axis classification, Dr. Vazquez evaluated Plaintiff's mental disorders consistent with the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS:

| THE FIVE-AXIS MODEL USED TO ACCOUNT FOR THE PATIENT'S MENTAL HEALTH. | DR. VAZQUEZ'S IMPRESSIONS OF PLAINTIFF'S MENTAL STATUS. |
|---|---|
| I.  Clinical Disorders | Major depression, severe with psychotic features and panic disorder. |
| II. Personality Disorders and Intellectual Disabilities | No diagnosis. |
| III. General Medical Condition | Fibromyalgia, chronic back pain, hypertension |
| IV. Psychosocial and environmental Disorders | Husband is unemployed. |
| V.  The GAF | 50. A score of 50 denotes serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work). |

(Docket No. 11, pp. 711-712 of 738).

17

## V.  LEGAL FRAMEWORK FOR EVALUATING DISABILITY CLAIMS.

DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6ᵗʰ Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).  The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical. *Id.*

When determining whether a person is entitled to disability benefits, the Commissioner follows a sequential five-step analysis set forth in 20 C.F.R. §§ 404.1520, 416.920. *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 512 (6ᵗʰ Cir. 2010).

> First, a claimant must demonstrate that he or she is not currently engaged in substantial gainful employment at the time of the disability application. *Id.* (*citing* 20 C.F.R. § 404.1520(b)).  Second, the claimant must show that he or she suffers from a severe impairment. *Id.* (*citing* 20 C.F.R. § 404.1520(c)).  Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months, which meets or equals a listed impairment, he or she will be considered disabled without regard to age, education, and work experience. *Id.* (*citing* 20 C.F.R. § 404.1520(d)).  Fourth, if the Commissioner cannot make a determination of disability based on medical evaluations and current work activity and the claimant has a severe impairment, the Commissioner will then review claimant's residual functional capacity (RFC) and relevant past work to determine if he or she can do past work; if so, he or she is not disabled. *Id.* (*citing* 20 C.F.R. § 404.1520(e); *Howard v. Commissioner of Social Security*, 276 F.3d 235, 238 (6ᵗʰ Cir.2002)).  If the claimant's impairment prevents him or her from doing past work, the analysis proceeds to the fifth step where the Commissioner will consider the claimant's RFC, age, education and past work experience to determine if he or she can perform other work. *Id.*  If the claimant cannot perform other work, the Commissioner will find him or her disabled. *Id.* (*citing* 20 C.F.R. § 404.1520(f)).

18

### VII. THE ALJ'S DECISION.

Upon careful consideration of the entire record, ALJ Loucas made the following findings on June

21, 2012:

1.  Plaintiff had not engaged in substantial gainful activity since March 15, 2011, the application date.

2.  Plaintiff had the following severe impairments:

    a.   Degenerative disc disease.
    b.   Fibromyalgia.
    c.   Anxiety.
    d.   Depression.

3.  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part. 404, Subpart P, Appendix 1.

4.  After careful consideration of the entire record, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform less than a full range of light work as defined in 20 C.F.R. §§404.1567(b), 416.967(b), except that:

    a.   She could engage in balancing on an unlimited basis.
    b.   She could frequently bend, crawl, crouch, kneel, stoop and climb ramps or stairs and never any ladders, ropes or scaffolds.
    c.   She required a sit/stand option, allowing her to change positions without interrupting the performance of her tasks.
    d.   She could occasionally push, pull and reach overhead bilaterally, provided she does not lift more than eight pounds overhead.
    e.   She must avoid moderate exposure to hazards.
    f.   She retained the capacity to understand, remember and carry out simple and detailed instructions frequently and up to complex instructions occasionally; she could maintain concentration, persistence and pace over a normal workday and workweek for work that was not machine driven pace and she could work independently or in a small group setting, could adjust to normal changes in the work place and could make work related decisions.

5.  Plaintiff was unable to perform her past relevant work.

6.  Plaintiff was a younger individual on the date the application was filed and she had at least a high school education and was able to communicate in English. Given Plaintiff's age,

19

education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform.

7.     Plaintiff had not been under a disability as defined in the Act since March 15, 2011, the date the application was filed (Docket No. 11, pp. 16-23 of 738).

## VIII.  THE LEGAL FRAMEWORK FOR JUDICIAL REVIEW.

In a social security appeal, the Court's inquiry is limited to determining whether the ALJ's non-disability finding is supported by substantial evidence. *Roberts v. Commissioner of Social Security*, 2014 WL 1123564, *1 (S.D.Ohio,2014) (*citing* 42 U.S.C. § 1383(c)(3); *Bowen v. Commissioner of Social Security*, 478 F.3d 742,745–46 (6th Cir.2007)).  Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* (*citing Richardson, supra*, at 1420; *Ellis v. Schweicker*, 739 F.2d 245, 248 (6th Cir.1984)).  Substantial evidence is more than a mere scintilla, *Id.* (*citing Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir.1988); *NLRB v. Columbian Enameling and Stamping Company*, 59 S.Ct. 501, 505 (1939), rather, substantial evidence must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. *Id.* (*citing LeMaster v. Secretary of Health and Human Services*, 802 F.2d 839, 840 (6th Cir.1986) (*quoting NLRB, supra*).

In determining whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Id.* (*citing Hephner v. Mathews*, 574 F.2d 359 (6th Cir.1978); *Ellis, supra*; *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536 (6th Cir.1981); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir.1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir.1984)).  The Court may not try the case de novo, resolve conflicts in evidence or decide questions of credibility. *Id.* (*citing Garner, supra*).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the Court as a trier of fact would have arrived at a different

20

conclusion. *Id.* (*citing Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir.1981)).

## IX. ANALYSIS.

Plaintiff asserts four claims:

(1)   The ALJ erred by failing to appropriately evaluate the opinions of Dr. Nickels.
(2)   The ALJ erred by failing to appropriately evaluate the opinions of Dr. Raheja.
(3)   The ALJ erred by failing to adopt the findings of Drs. Nickels and Raheja as it relates to sedentary work.
(4)   The ALJ erred by failing to appropriately evaluate Plaintiff's credibility.

Defendant responded:

(1)   Substantial evidence supports the ALJ's evaluation of physician evidence.
(2)   Substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints were not fully credible.

### 1.   DID THE ALJ COMMIT REVERSIBLE ERROR BY FAILING TO EVALUATE THE OPINIONS OF DR. NICKELS?

Plaintiff argues that ALJ failed to give appropriate deference to the opinions of Dr. Nickels. In the alternative, Plaintiff suggests that the reasons given for discounting the opinions are ill-founded and prejudicial.

### A.   THE TREATING PHYSICIAN RULE.

Social Security regulations require an ALJ to give the opinion of a claimant's treating physician (including a treating psychiatrist) controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Russell v. Commissioner of Social Sec*urity, 2014 WL 667795, *4 (S.D.Ohio,2014) (*citing* 20 C.F.R. § 416.927(c)(2); *accord Johnson–Hunt v. Commissioner of Social Security*, 500 Fed.Appx. 411, 417 (6th Cir.2012) (finding the ALJ erred in failing to give controlling weight

to the opinion of claimant's treating psychiatrist under the treating physician rule). "Even if [a] treating physician's opinion is not given controlling weight, there remains a presumption, albeit a rebuttable one, that the opinion . . . is entitled to great deference." *Id.* (*citing Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir.2009) (citation omitted)).

Where the treating source's opinion does not receive controlling weight, the decision must justify the assignment given in light of the factors set out in 20 C.F.R. §§ 1527(d)(1)-(6). *DeHaven v. Commissioner of Social Security*, 2014 WL 903112, *5 (N.D.Ohio 2014). In other words, the ALJ is required to provide "good reasons" for discounting the weight given to a treating source's opinion. *Russell, supra,* at *4 (*citing* 20 C.F.R. § 416.927(c)(2)). The ALJ must state that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record, identify evidence supporting such finding and explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion.

Given the significant implications of a failure to properly articulate ( i.e., remand) mandated by the *Wilson v. Commissioner of Social Security*, 378 F. 3d 541 (6th Cir. 2004) decision, an ALJ should state what weight he or she assigns to the treating source's opinion and then discuss the evidence of record supporting that assignment. *DeHaven*, *supra*. The Sixth Circuit has identified certain breaches of the *Wilson* rules as grounds for reversal and remand:

- the failure to mention and consider the opinion of a treating source, *Id.* (*citing Blakely v. Commissioner,* 581 F.3d 399, 407-408 (6th Cir. 2009)).
- the rejection or discounting of the weight of a treating source without assigning weight, *Id.* (*citing Blakely*, 581 F.3d at 408).
- the failure to explain how the opinion of a source properly considered as a treating source is weighed ( i.e., treating v. examining ), *Id.*
- the elevation of the opinion of a non-examining source over that of a treating source if the non-examining source has not reviewed the opinion of the treating source, *Id.* (*citing*

22

*Blakely*, 581 F.3d at 409).

- the rejection of the opinion of a treating source because it conflicts with the opinion of another medical source without an explanation of the reason therefor, *Id.* (*citing Hensley v Astrue*, 573 F.3d 263, 266–67 (6th Cir. 2009)).
- the rejection of the opinion of a treating source for inconsistency with other evidence in the record without an explanation of why "the treating physician's conclusion gets the short end of the stick." *Id.* (*citing Friend v. Commissioner of Social Security*, 375 F. App'x 543, 551–552 (6th Cir. 2010)).

The Sixth Circuit has determined that a violation of the "good reasons rule" is considered harmless error if (1) the treating source's opinion is so patently deficient that the commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goals of Section 1527(d)(2) . . . even though he or she has not complied with the terms of the regulation.  *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011) (*citing Friend v. Commissioner of Social Security*, 375 Fed.App'x. 543, 551 (6th Cir. 2010)(*quoting Wilson*, 378 F.3d at547)).

**B.    THE APPLICATION OF THE TREATING PHYSICIAN RULE AND THE GOOD REASONS REQUIREMENT AS IT RELATES TO DR. NICKELS.**

Plaintiff has expressed skepticism as to the ALJ's failure to comply with the goals of Section 1527(d)(2) and asks the Court to reverse and remand this case to the Commissioner for the reason that the ALJ's perception of the facts are "specious at best and outright wrong at worst."

The Magistrate Judge finds that the ALJ did not routinely ignore Dr. Nickel's opinions or make a summary dismissal.  Rather the ALJ managed to intertwine succinct and clear statements of "good reasons" while complying with the *Wilson* mandates.  The ALJ started her analysis by explaining that the factors listed in 20 C.F.R. § 404.1527 were required to determine the weight that should be given to the treating source's opinion (Docket No. 11, p. 18 of 738).  It is uncontested that the ALJ considered Dr. Nickels Plaintiff's treating physician and his opinions were not entitled to controlling weight.  The ALJ

did not automatically defer to Dr. Nickels' judgments because the record makes it clear that Dr. Nickels' lengthy treatment relationship was limited to the maintenance and prevention of pain related primarily to lumbar radiculopathy and degenerative back disease during the period that Plaintiff alleged she was disabled.  Given Dr. Nickels' area of expertise, the ALJ found his functional limitations less persuasive than the opinions of Disability Determination Services' evaluators and others who actually treated and/or performed clinical and diagnostic tests used to measure functional deficiencies indicative of the disease. Furthermore, the ALJ gave no special consideration to Dr. Nickels' conclusions as to whether Plaintiff was disabled as that was not for him to decide (Docket No. 11, p. 21 of 738).

The reasons given by the ALJ for discounting Dr. Nickels' opinions have been recognized by the Sixth Circuit as a valid basis for refusing to give controlling weight to the opinion of a treating source. The ALJ's decision is sufficiently structured as to remove any doubt for subsequent reviewers why she discounted Dr. Nickels' opinions and what weight she gave Dr. Nickels' opinions.   Under these circumstances, the ALJ appropriately decided that Dr. Nickels' opinions were not definitive of disability.

With regard to requirements of *Wilson* and its progeny, the ALJ stated what weight she assigned to Dr. Nickels' opinion and then articulated the evidence of record that sustained his findings.  By implication, the ALJ suggested that when Dr. Nickels records were reviewed as a whole, there is no basis for controlling weight.  Upon review of records, the Magistrate is persuaded that Dr. Nickel's medical records are probative of Plaintiff's ongoing treatment for pain, nothing more.  Plaintiff's complaints became routine and Dr. Nickels responded by continuing the medication regimen after determining whether Plaintiff had been medication compliant and if there were pronounced side effects.  Once he ordered an MRI and once he made a referral to a podiatrist (Docket No. 11, pp. 586-601, 602, 618-628, 698-704 of 738).  As a whole, there was nothing on which Dr. Nickels could base a finding of disability

24

or functional limitations.  Dr. Nickels findings were clearly not supported by medically acceptable clinical and laboratory techniques.  In light of these factors, the ALJ determined that Dr. Nickels' opinion was entitled to little weight.

Considering the implications of a failure to properly articulate what weight the ALJ assigns to the treating source's opinion and the evidence in support of the assignment, the ALJ's decision contains enough discussion and analysis to satisfy the requirements of *Wilson,* thereby removing all doubt as to the weight given Dr. Nickels' opinion and the reasons for assigning such weight.  Any errors that the ALJ committed in this regard were harmless and did not result in reversible error under the *Wilson* rule.

**2.    THE APPLICATION OF THE TREATING PHYSICIAN RULE AND THE GOOD REASONS REQUIREMENT AS IT RELATES TO DR. RAHEJA.**

Plaintiff argues that the ALJ never gave any reason for rejecting the restrictions advanced by Dr. Raheja on lifting and carrying.

In the instant case, it appears that the ALJ wanted to minimize the deference generally given to treating sources when he referred to Drs. Raheja as a treating provider.  Dr. Raheja's opinions were not absolute insofar as he actually saw Plaintiff three times:  once when conducting a consultative examination on January 14, 2011; again on February 21, 2011 when he was discussed the results from the MRI; and finally on January 16, 2012, when he treated Plaintiff for headache symptoms, ordered laboratory reports to the test the sufficiency of Plaintiff's kidneys and conducted a medication compliance analysis (Docket No. 11, pp. 490-496, 720-723 of 738).  The medical source statement completed by Dr. Raheja on March 30, 2011, suggested that his conclusions were derived from administrative review.  The extreme limitations in Plaintiff's functional and work-related abilities are completely conclusory, inadequately explained and not supported by Dr. Raheja's own medical notes or narratives (Docket No. 11, pp. 508-509 of 738).

25

Nevertheless, as required by the regulations, the ALJ appropriately considered Dr. Raheja's findings and conclusions.  The ALJ explained why he discounted the opinions and how such opinions affected the weight accorded the opinions.  Applying the relevant factors, there was sufficient justification to discount Dr. Raheja's March 30, 2011-decision in which he claimed that Plaintiff could only lift five pounds.  First, the conclusions were based on a limited examining relationship.  Second, Dr. Raheja offers nothing more than conclusions based on limited observation, not treatment or medical evidence.  Third, the conclusions were made in conflict with other evidence in the record (Docket No. 11, pp. 20-21 of 738).

It cannot be said that the ALJ failed to apply the treating physician rule or that she failed to make it sufficiently clear what weight she attributed to Dr. Raheja's opinions.  In making this analysis, the ALJ was free to discount Dr. Raheja's opinions about Plaintiff's inability to lift and carry to the extent that they were speculative and unsubstantiated.

**3.      WAS THE ALJ'S FAILURE TO ADOPT THE FINDINGS OF DRS. RAHEJA AND NICKELS, ERROR?**

Plaintiff reported that Drs. Raheja and Nickels found that Plaintiff was limited to carrying five pounds.  If the ALJ had adopted this limitation, the occupation base for employment would have been significantly eroded to the point that there were no sedentary jobs that Plaintiff could perform and a decision of disability would be warranted.

An ability to do a full range of sedentary of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK-IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, SOCIAL SECURITY RULING 96-9p, 1996 WL 374185, *3 (July 2, 1996).  Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. *Id.*  Jobs

26

are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *Id.* "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. *Id.* Sitting would generally total about 6 hours of an 8-hour workday. *Id.* If the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and work experience. *Id.*

Mindful of the directives in SSR 96-9p, the Magistrate Judge finds several reasons to reject Plaintiff's claim that given the five pounds' limitation, she cannot perform sedentary work and is therefore disabled. First, there is no authority that the inability to perform substantially less than all sedentary occupations translates into disability. Second, Plaintiff has failed to present other credible evidence that she is limited to lifting five pounds or less in light of the fact that Drs. Nickels and Raheja's opinions in that regard have been appropriately discounted. Third, the VE was emphatic that there were a number of jobs that exist in significant numbers that an individual could perform even with a sedentary occupational base that has been eroded (Docket No. 11, p. 59 of 738). Fourth, a restriction to occasional lifting of five pounds, by itself, only minimally erodes the occupational base for sedentary work requires that the claimant have the ability to lift **no more than** 10 pounds at a time and occasionally lift or carry articles such as docket files, ledgers, and small tools.

The Magistrate Judge is persuaded that there is no basis for a finding that Plaintiff's ability to engage in unskilled sedentary work is sufficiently eroded to the extent that she should be found disabled. Plaintiff's claim lacks merit and the Magistrate recommends that it be dismissed.

## 4.    CREDIBILITY.

Plaintiff contends that SSR 96-7p requires an assessment of credibility. The ALJ's credibility is

not based on substantial evidence and is therefore ripe for reversal and remand.

A.    THE REGULATION– SSR 96-7P.

In relevant part, SSR 96-7p,  describes a two-step process for evaluating symptoms, such as pain,

fatigue, shortness of breath, weakness, or nervousness:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms.  Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY

OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, *1-*2, SSR 96-7p (July 2, 1996).  When additional

information is needed to assess the credibility of the individual's statements about symptoms and their

effects, the adjudicator must make every reasonable effort to obtain available information that could shed

light on the credibility of the individual's statements.  *Id*. at *3.  In recognition of the fact that an

individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown

by the objective medical evidence alone, 20 C.F.R. 404.1529(c) and 416.929(c) describe the kinds of

evidence, including the factors below, that the adjudicator **must consider** in addition to the objective

medical evidence when assessing the credibility of an individual's statements:

(1)    The individual's daily activities;
(2)    The location, duration, frequency, and intensity of the individual's pain or other symptoms;
(3)    Factors that precipitate and aggravate the symptoms;
(4)    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.*

Once the adjudicator has determined the extent to which the individual's symptoms limit the individual's ability to do basic work activities by making a finding on the credibility of the individual's statements, the impact of the symptoms on the individual's ability to function must be considered along with the objective medical and other evidence, first in determining whether the individual's impairment or combination of impairments is "severe" at step 2 of the sequential evaluation process for determining disability and, as necessary, at each subsequent step of the process. *Id*. (*See* SSR 96-3p, "TITLES II AND XVI: CONSIDERING ALLEGATIONS OF PAIN AND OTHER SYMPTOMS IN DETERMINING WHETHER A MEDICALLY DETERMINABLE IMPAIRMENT IS SEVERE," and SSR 96-8p, "TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS.")

1.    **CLAIM ONE–THE ALJ REJECTED PLAINTIFF'S COMPLAINTS OF LOW BACK PAIN**.

The ALJ rejects Plaintiff's complaints of severe low back pain because the level of severity is not supported by the objective medical evidence. Plaintiff had a history of low back pain attributed to prior surgery, mild disc bulging and central disc herniation. The electrodiagnostic evidence of the thoracic spine was generally normal in appearance and signal characteristics and the vertebral bodies were aligned and generally only minimal degenerative changes were observed. There was no evidence of fracture or bone marrow disease of the spinal cord or active denervation to support active radiculopathy or evidence of a deviation from or interruption of the normal function of the body that manifests itself in the severity

of Plaintiff's back pain (Docket No. 11, pp. 450, 475-477, 491-492, 494-495, 497-498, 502-504, 515, 516, 519, 520, 521, 539-540, 589, 591, 593, 596, 601, 602, 607-611, 615, 618-619, 621-628 of 738).

The Magistrate Judge is persuaded that the ALJ's conclusions were well within the zone of reasonable choices that the ALJ could make, particularly since the medical evidence showed minimal deviation or interruption of normal body function due to Plaintiff's back pain.  Moreover, there is considerable ambiguity as to whether Plaintiff's allegations of pain could be manifested with the severity she claims.  Because credibility is peculiarly within the judgment of the ALJ and this ALJ made a reasoned and reasonable decision based upon the evidence, the Magistrate maintains that her assessment of Plaintiff's credibility must be afforded due deference.

2. **CLAIM 2–THE ALJ REJECTED PLAINTIFF'S CONSERVATIVE TREATMENT REGIMEN.**

Next, Plaintiff claims that the ALJ erroneously relied on Plaintiff's alleged conservative course of treatment as evidence that she is not disabled.

Plaintiff's counsel makes a statement in the Brief on the Merits that "nowhere in the record is there the slightest suggestion that Ms. Ortega has been noncompliant with the recommendations of her doctors." The Magistrate does not find that the ALJ ever suggested that she was noncompliant or that her credibility was compromised as a result.  The record does suggest, however, that except for surgical interventions, the ALJ considered Plaintiff's conservative treatment regimen including drug therapy and counseling in assessing credibility.  Plaintiff's credibility was impacted by her treatment, specifically, the type, dosage, effectiveness, and side effects of any medication she had taken to alleviate pain or other symptoms.  The ALJ was not only entitled to discuss Plaintiff's treatment and the effectiveness of her medications, it was imperative that she do so to make a credibility determination that complied with the regulations. Plaintiff's credibility is not undermined by the ALJ's consideration of her medications.

30

**3.**     **PLAINTIFF CLAIMS THAT THE ALJ MISSTATED THE EVIDENCE.**

Plaintiff takes issue with the ALJ's failure to understand a subtle nuance in her testimony.  She never testified that she could not leave her home; she testified that she could not leave her home alone.

On judicial review of a denial of disability insurance, the Magistrate determines that second guessing the credibility findings of the ALJ is inappropriate and therefore, her review is limited to whether the ALJ's decision was supported by substantial evidence and based on the proper legal standards.  In determining the existence of substantial evidence, the Magistrate has examined the record as a whole and if the ALJ's decision is supported by substantial evidence, it must be affirmed.

The evidence supports the ALJ's contention that the record as a whole shows inconsistencies in Plaintiff's ability to leave home.  On one hand, Plaintiff gave the appearance that she was fearful of being in public places and that she did not leave her home:

> Q.     And do you go through the store and get the groceries.
> A.     Yes.
> Q.     Would you be able to do that by yourself?
> A.     No.
> Q.     Why not?
> A.     I tried and I just can't leave the house.

(Docket No. 11, p. 49 of 738).

> Q.     . . .. .Do you think you'd be able to do that job on a full-time basis?
> A.     No.
> Q.     What would keep you from doing that kind of work?
> A.     Leaving my house.

On the other hand, Plaintiff left her home daily to take her children to school and occasionally she left to keep appointments.  The ALJ considered that Plaintiff was driving when she was involved in a motor vehicle accident at 11:00 A.M. on Sunday, March 18, 2012.  Albeit in the company of her husband,

31

Plaintiff left her house to grocery shop and to occasionally visit their parents (Docket No. 11, p. 39 of

738).    A.    If it's by myself I only go to like when I have to go to my appointment and I don't have
              anybody else to take me.
        Q.    Do you go to the grocery store?
        A.    With my husband.

(Docket No. 11, p. 49 of 738).

This Court is not authorized to review the evidence *de novo*; however, it is clear that the ALJ chose

evidence that bolstered her conclusion to discredit Plaintiff's complaints of anxiety attacks.  She did not,

however, ignore evidence that failed to support her conclusions in assessing credibility.  The result was

a well-reasoned decision which called into question, Plaintiff's assertions that she was unable to leave

home.  Having followed the appropriate regulations, the ALJ was authorized to use this inconsistency in

determining credibility.

**X.  CONCLUSION**

The Magistrate recommends that this Court affirm the Commissioner's decision and terminate the

referral to the undersigned Magistrate Judge.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:  June 11, 2014

### XI.  NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.